RECEIVED

14 JUL 31 PM 3: 52

CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF IOWA
# CENTRAL DIVISION

| | |
|---|---|
| CHARLES D. CULLOR,<br><br>      Plaintiff<br><br>    v.<br><br>JOHN BALDWIN, HARBONS DEOL,<br>SHERYL LOCKWOOD-DAHM,<br>NICK LUDWICK, REBECCA BOWKER,<br>DAVE DEGRANGE, MARK LARSON,<br>STEPHANIE COOPER, GRANT ABERNATHY,<br>and MONICA NYE,<br><br>      Defendants | No: 4:12-cv-00116-JEG-CFB<br><br><br>**REPORT**<br>**AND**<br>**RECOMMENDATION** |

This matter comes before the Court on a Motion for Summary Judgment (ECF No. 43), filed January 31, 2014, by Defendants John Baldwin, Harbons Deol, Sheryl Lockwood-Dahm, Nick Ludwick, Rebecca Bowker, Dave DeGrange, Mark Larson, Stephanie Cooper, and Monica Nye. Plaintiff Charles Cullor filed a Resistance (ECF No. 54) on June 1, 2014. Defendant Grant Abernathy was never served with process, has never entered an appearance in this action, and is not a party to the Motion for Summary Judgment. The remainder of this Report and Recommendation will refer collectively to the Defendants who have appeared and are moving for Summary Judgment as "Defendants."

The deadline for filing dispositive motions was January 24, 2014, seven days before Defendants filed their Motion for Summary Judgment. Plaintiff was informed at a January 13, 2014 Status Conference of Defendants' intention to move for summary judgment, see Minute Entry at 1, ECF No. 41; has not moved to strike the Motion; and received four extensions of time to resist the motion. Plaintiff was not prejudiced by the Defendants' untimeliness in filing their Motion. See Rustan v. Rasmussen, 208 F.3d 218 (8th Cir. 2000) (per curiam) (unpublished table decision) ("We conclude the District Court did not err in accepting defendants' summary

1

judgment motion, even though it was filed five days after the deadline for dispositive motions set by the Court's scheduling order, because the tardy filing did not prejudice [plaintiff] under the circumstances . . . ."). It is respectfully recommended that the Court consider Defendants' Motion for Summary Judgment to be fully submitted and ripe for disposition.

On March 14, 2014, this case was referred to the undersigned for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B).[1] This case is currently set for a Final Pretrial Conference at 10:00 A.M. on September 2, 2014, before the undersigned, and a three-day jury trial commencing September 15, 2014, before the Honorable James E. Gritzner.

# I. INTRODUCTION

Plaintiff Charles Cullor brings this action under 42 U.S.C. § 1983, alleging that Defendants violated his Eighth Amendment right against cruel and unusual punishment by demonstrating deliberate indifference to his serious medical needs, specifically, his need for partial dentures from 2005 to 2010, and his need for complete dentures since having the last of his teeth removed in October 2010. He seeks declaratory and injunctive relief, as well as compensatory and punitive damages, along with fees, costs, and any other appropriate relief. All Defendants are sued in their individual and official capacities.

Plaintiff filed his Complaint on March 19, 2012. After Initial Review (ECF No. 8), the Defendants remaining in the suit are:

1. John Baldwin, Director, Iowa Department of Corrections (IDOC);
2. Harbons Deol, Medical Director, IDOC;
3. Sheryl Lockwood-Dahm, Assistant Deputy Director, IDOC;
4. Nick Ludwick, Warden, Iowa State Penitentiary (ISP);
5. Rebecca Bowker, Executive Officer I, ISP;
6. Dave DeGrange, Grievance Officer, ISP;
7. Mark Larson, DDS, Dentist, ISP;
8. Stephanie Cooper, DDS, Dentist, ISP;
9. Grant Abernathy, Dentist, ISP; and
10. Monica Nye, Dental Assistant, ISP.

---

[1] An earlier Order referring this case pursuant to § 636(b)(1)(B) was entered on January 7, 2013, prior to the filing of Defendants' Motion for Summary Judgment. See ECF No. 23.

Cullor alleges that Larson, Abernathy, and Cooper "failed to treat [his] serious medical/dental needs due to the fact they were part time dental staff and were not given the time or opportunity to take impressions and provide [him] with dentures." Complaint ¶ 21, ECF No. 1. He alleges that Nye "performed a chart review that made clear [that he] required dentures." Complaint ¶ 13. He alleges that DeGrange "refused to take corrective action to address [his] serious medical/dental needs . . . by advising [him] he would have to await [sic] his turn on a waiting list for dentures." Complaint ¶ 28. Cullor alleges that Bowker and Lockwood-Dahm also "refused/failed to take corrective action as grievance officials," after receiving his appeal from DeGrange's grievance decision. Complaint ¶ 31. Cullor alleges that Ludwick failed to take corrective action after being informed of the length of the waiting period for dentures in December 2010. Complaint ¶¶ 9–11.

Cullor alleges that Deol "intentionally and knowingly failed or refused to adequately staff the ISP with sufficient dentists to . . . provide dental services to [him] and the ISP prisoner population." Complaint ¶ 6. He alleges that Baldwin "knowingly and intentionally refused or failed to establish and maintain acceptable standards of dental care for prisoners . . . by failing to insure that adequate and sufficient dentists [were] employed at the ISP." Complaint ¶ 2.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the non-moving party. Chao v. Barbeque Ventures, LLC, 547 F.3d 938, 941 (8th Cir. 2008). On a motion for summary judgment, the Court views all the facts in the light most favorable to the non-moving party. See Popp Telecom, Inc. v. Am. Sharecom, Inc., 361 F.3d 482, 487 (8th Cir. 2004). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" Atkinson v. City of Mountain View, Mo., 709 F.3d 1201, 1207 (8th Cir. 2013) (quoting Dahl v. Rice Cnty., Minn., 621 F.3d 740, 743 (8th Cir. 2010)); see Fed. R. Civ. P. 56(c)(1).

## III. MATERIAL FACTS NOT IN DISPUTE

The following facts are undisputed or viewed in the light most favorable to Cullor, the non-moving party.

Cullor is presently 69 years old, and has a job as an aide in ISP's Health Care Unit (HCU). He has resided at ISP since October 1980, and is serving multiple life sentences. He has received medical and dental care while at ISP. He has acid reflux, and receives prescription medication for this condition. He receives regular checkups, and can ask for additional medical appointments in the HCU. Cullor was also able to discuss his medical issues with the medical staff while he was at work in the HCU.

Cullor has received regular dental checkups. He has a history of significant tooth decay, and over the course of his time at ISP has had several teeth extracted by the prison dentists and on October 13, 2010, his remaining teeth were extracted at the University of Iowa.

ISP has employed five dentists since 2009. Tessa Johnson, DDS, has served as ISP's dentist since July 6, 2012. Prior to Dr. Johnson's arrival, ISP employed several dentists on a part-time basis, including Defendants Larson, Cooper, and Abernathy. All of the part-time dentists left ISP voluntarily for non-monetary reasons.

At ISP, inmates' dental needs are ranked based on medical necessity. Only the staff dentist at ISP is authorized to place an inmate on the Denture List, which indicates that the dentist has determined that the inmate has a need for a partial plate or complete dentures. To qualify to be on the Denture List at ISP, an inmate must have fewer than eight posterior teeth in contact, or be missing three posterior teeth in a row. This standard is consistent with the Iowa Medicaid standard, under which patients may qualify for dentures if they are missing any three adjacent teeth. This is a public insurance standard that varies by state. For example, under the Illinois Medicaid standard, a patient must be missing all of his or her teeth to qualify for dentures.

Although Cullor has been an inmate at ISP since 1980, the records submitted for consideration in this case only include dental chart notes starting in 2005, and the record does not include Cullor's HCU medical chart notes or summary of his health conditions, or any information about changes to his health since being placed on the Denture List. The dental chart notes are at times incomplete or inconsistent.[2] Defendants admit that they cannot establish when Cullor was placed on the Denture List, or which dentist ordered his placement on this list.

---

[2] For instance: chart notes dated July 28, 2005, through November 23, 2009, indicate "Needs Dentures: No," Def. App. 10–32, but are followed by a second chart note dated November 23,

The dental records submitted start with an examination on July 28, 2005. At that time, Cullor was missing eleven teeth.[3] As of August 3, 2005, Cullor qualified to be on the Denture List, as he was missing at least three adjacent posterior teeth (he was missing twelve posterior teeth: three lower on each side, and three upper on each side) and had fewer than eight posterior teeth in contact. Viewing the record in the light most favorable to Cullor, Dr. Snow placed him on the Denture List on August 3, 2005. On August 10, 2006, Dr. Snow completed a preliminary examination of Cullor for "partials," although the chart note also indicates "Needs Dentures: No." Def. App. 12.

On November 29, 2006, Dr. Snow provided a filling to Cullor's tooth number 11 (upper left front), and took an X-ray of tooth number 12 (also upper left front). On March 13, 2007, a filling was started for Cullor's tooth number 12 (upper left front); this tooth was permanently repaired on April 14, 2008, at which time a repair was started on tooth number 5 (upper right front). On April 10, 2007, hygienist Denise Mortimore noted that six of Cullor's teeth needed restoration (numbers 4, 7, 8, 9, 10, and 13).

In February 2009, Cullor was treated for mouth sores (bilateral mucosa apthae ulcers) with an ointment. These sores cleared up in about a month; he was provided a standing prescription to address this problem. On June 18, 2009, dental staff saw Cullor again regarding his complaints of mouth sores. During this examination, a large cavity was noted in tooth number 20 (lower left), which was filled, along with cavities in teeth numbers 21, 22, and 23 (lower left). At Cullor's annual dental screening on October 8, 2009, it was noted that he needed two teeth extracted (numbers 5 and 12), although this work was not done, and that he needed a complete upper denture and partial lower denture, which was also not performed at that time. The dental chart note for October 27, 2009—when Cullor was being seen for emergency

---

2009, that indicates "Needs Dentures: Yes," followed by all subsequent charts through February 1, 2013, indicating "Needs Dentures: Yes." Def. App. 33–61.

There are chart notes indicating a preliminary exam for a partial plate on August 10, 2006, that also indicates "Needs Dentures: No." Def. App. 12. Dr. Snow's Dental Chart Note of August 3, 2005, indicates "Needs Dentures: No," Def. App. 11, yet all of the chart notes subsequent to March 23, 2010, carry the notation: "Leave on Denture List per Dr. Snow's Dental Encounter 8/3/05 and 8/10/06," and "F/P per Dr. Snow 8/3/05; Leave this note/comment on here." Def. App. 34–52.

[3] See Attachment A, a diagram prepared by the undersigned based upon a review of the dental chart notes in the record, for a summary of Cullor's teeth missing as of 2005, and dental procedures thereafter.

palliative treatment for pain and given a mouth rinse—indicates "Needs Denture: No." Def. App. 29.

On November 17, 2009, Defendant Larson, then a part-time dentist at ISP, extracted two of Cullor's teeth: numbers 12 and 13 (upper left). Cullor had sent a kite, or inmate memo, to the Dental Department on November 15, 2009, complaining of a broken tooth. This kite was received the next day, and treatment provided on November 17, 2009. Cullor is not complaining of this delay in treatment.

On March 23, 2010, Defendant Nye, a dental assistant at ISP, performed a review of Cullor's chart, and noted that "Per Dr. Snow 8/3/05," Cullor was a Priority II patient, requiring a complete upper denture and partial lower denture, and that this work had not been started, but to "leave [Cullor] on [the] denture list." Def. App. 34.

On August 12, 2010, Cullor was treated for an oral yeast infection by the HCU, and this was noted in his dental chart. On August 17, 2010, Cullor received his annual dental screening and teeth cleaning from the hygienist. On August 18, 2010, Dr. Larson referred Cullor to the University of Iowa for FMTE (full mouth teeth extraction with sedation). As part of this referral, Cullor signed an IDOC form consenting to the surgery, which acknowledged that:

> I agree to have these teeth extracted with the understanding that these teeth may not be replaced while in the D.O.C. I am aware denture and partial lists are very long and even if I should qualify to have them for functional purposes, there is no guarantee I will get them while in the D.O.C.

Def. App. 38.

Cullor's FMTE was completed at the University of Iowa on October 13, 2010, leaving him edentulous.[4] Nye provided follow-up care at ISP. On November 1, 2010, Cullor complained that the soft diet that had been prescribed following his FMTE was not being provided by the kitchen, and that he needed to have his stitches checked. He was examined on November 2, 2010, and Defendant Cooper, then also a part-time dentist at ISP, wrote an order for his food to be ground, with only canned fruits or soft-cooked vegetables, to ensure adequate nutrition and reduce the risk of choking.

On the chart for Cullor's August 8, 2011 annual dental screening, it continued to be noted that Cullor needed a complete lower denture, per Dr. Snow on August 3, 2005. On August 23,

---

[4] "Edentulous" is the dental term for being without teeth. Cooper Dep. 6:16–17, Pl. App. 42.

2011, Cullor sent a kite to the ISP dental staff, asking when he would receive dentures. In this kite, he complained that he could not chew effectively because his gums did not come together, had constant headaches and jaw pain because he could not chew properly, and that his acid reflux was exacerbated by his diet and inability to chew. He also complained that a lack of dentures made it hard for people to understand him when he spoke. Nye responded to the kite, writing that she did not know when dentures might be forthcoming, as ISP only had a dentist on staff one day per week. She noted that Cullor's next annual review was a year away, set for August 17, 2012. Nye stated in her response to the kite that she would schedule Cullor to see the dentist, but it does not appear from the records that any dental personnel examined Cullor in relation to his August 23, 2011 kite.

On October 25, 2011, Cullor filed a grievance, outlining his history of dental treatment, Dr. Snow's recommendation for dentures in August 2005, the removal of his remaining teeth in October 2010, and his contention that he had a "serious medical need" for dentures in order to alleviate his pain and constant headaches, and noting that his inability to chew exacerbated his acid reflux. Def. App. 62–64. He requested that he immediately receive dentures. Defendant DeGrange, a grievance officer at ISP, investigated by emailing "Nursing Supervisor Roger Harrison," and responded that the grievance would be "sustained," as Cullor was on the list to receive dentures, although it could not be predicted when he would actually receive them. Def. App. 68. DeGrange also advised Cullor—in accordance with Harrison's response to DeGrange's email inquiry—that ISP had a new dentist, the Denture List was being addressed, and that he was near the top of the list. DeGrange, at Harrison's insistence, urged Cullor to be patient.

On November 14, 2011, Cullor appealed DeGrange's decision, and requested a more definitive answer as to when he would receive dentures. He reiterated that he was in pain, and noted that analgesics and other pain relievers had not been effective. On November 18, 2011, Defendant Bowker denied the appeal, as she could not provide Cullor with a date when he would receive dentures. On November 28, 2011, Cullor appealed to the IDOC Central Office, indicating (for the first time in the records presented) that he choked on any food larger than "pea size," and that if the food provided is not soft, he cannot cut it with his spork.[5] Def. App. 74. He

---

[5] See Spork, n., Oxford English Dictionary, http://www.oed.com/view/Entry/187463?redirected From=spork#eid (last visited July 23, 2014) (defining "spork" as "[a] proprietary name for a piece of cutlery combining the features of a spoon, fork, (and sometimes, knife)").

complained of constant jaw pain because his gums could not come together. On December 13, 2011, Defendant Lockwood-Dahm responded: "I concur with the institutional response," and denied the grievance. Def. App. 75.

On May 31, 2012, Nye authored a note in Cullor's chart, which reads: "Ask Dr. Deol if we should wait to see this offender until law suit [sic] is settled?" Def. App. 50. There is no response to this note in the record.

On August 20, 2012, Tessa Johnson, DDS, ISP's dentist since July 2012, examined Cullor and began the process of creating impressions for dentures. Final impressions were created on September 17, 2012, and on November 13, 2012, Cullor received complete upper and lower dentures, which were adjusted. Dr. Johnson has made follow-up adjustments to Cullor's dentures.

Dr. Stephen Sparks, a licensed physician who works in the HCU at ISP, testified in his deposition that swallowing large chunks of food due to inability to chew would not tend to exacerbate chronic acid reflux. Dr. Sparks also testified that patients with esophageal strictures are at a greater risk for choking episodes when unable to chew, but that this esophageal choking—as opposed to choking in the airway—was distressful, but not deadly. Dr. Sparks testified that ISP medical staff "thought [Cullor] might have had a stricture before 2002," and that put him at greater risk for a stricture from 2006 to 2012, when he was on the Denture List, but that he could not determine whether Cullor actually had a stricture during that time. Sparks Dep. 23:13–19, Pl. App. 97.

Dr. Sparks testified that complaints of jaw pain are common in edentulous patients. He also testified that as a medical doctor, his recommendation to an edentulous patient experiencing jaw pain would be anti-inflammatory drugs, rather than dentures.

Dr. Johnson testified that, in her time at ISP since July 2012, she has worked through the denture list as quickly as possible, but she prioritizes inmates who need emergency care. She testified that the ISP dentist has the authority to advance patients on the Denture List, if medical circumstances warrant doing so, but that there are "very few circumstances where that would be." Johnson Dep. 8:22–9:3, Pl. App. 47–48. Dr. Johnson testified that in free-world private practice, two to three months is the ordinary wait for a patient to receive dentures, after a dentist determines they are appropriate. Regarding the medical necessity of dentures, though, Dr. Johnson testified as follows:

> Q.     So you are saying that as a dentist you believe it's reasonable for a patient to wait for six years from the time they get on the list until they get their dentures?
>
> A.     Yes.
>
> . . . .
>
> Q.     Yes. Would 20 years be unreasonable?
>
> A.     We're not talking about something that's medically necessary.

Johnson Dep. 21:13–16, 23–25, Pl. App. 54.

Defendant Deol, the IDOC Medical Director, and a physician who specializes in internal medicine, testified that an offender's placement on the Denture List is an indication by the staff dentist that dentures are medically necessary, but not necessarily a diagnosis of a serious medical need. Regarding the amount of time an offender on the list would have to wait for dentures, though, Dr. Deol testified as follows:

> Q.     So in terms of this length of time, I don't remember whether I've asked this, but you think that that's a reasonable length of time for an inmate to wait for dentures, three and a half years?[6]
>
> A.     I'm not sure what a reasonable amount of time is but I think it's a medical necessity issue that we go by and we also take a lot of factors into consideration, who needs the dentures right away or we can possibly wait because of the other factors we talked about, weight gain, weight loss, nutrition issues. We do assess them by getting dietary counsel to make sure he's getting appropriate nutrition, calories per day, and his food is actually provided so that he's able to chew or eat appropriately.
>         So there's [sic] a lot of factors that go into play. Maybe not have any resources for the dentist. That's probably what the delay is.
>
> Q.     Okay. You'd agree, though, to get on the list, that doesn't mean that its approval is a determination that he needs dentures, correct?

---

[6] This period of time refers to the time spent on the Denture List by the plaintiffs in Alspach v. Baldwin, a similar case recently before this Court. See 4:11-cv-00383-JAJ (S.D. Iowa July 21, 2014) (Order on Defs.' Mot. Summ. J. at 2). The parties agreed that testimony taken in connection with the Alspach matter would be used in this matter.

A.    Correct.

Deol Dep. 30:20–31:15, Pl. App. 73.

Over the time that Cullor waited for dentures, the IDOC made efforts to secure additional dental staff specifically for ISP. Dr. Deol and his predecessor, Edward O'Brien, D.O., explored various approaches, including offering programs for retired dentists, targeting new dentists with programs to forgive student loans in exchange for service at the prisons, and offering part-time work to accommodate schedules of practicing dentists. Dr. Deol testified that he is constantly recruiting medical and dental professionals, but that "having to recruit physicians for ISP and dentists is a challenge." Deol Dep. 15:22–23, Pl. App. 70. Dr. Deol testified that the maximum salary he could offer a new dentist at ISP as of November 2012 was $115,000, and admitted that the salary being offered was probably a factor in his difficulty hiring dentists, but that he offered the maximum salary budgeted to new candidates, and sought an increase above that for dentists with special skills.

John Ault, Defendant Ludwick's predecessor as ISP's Warden, testified that the warden has no authority over, or involvement with, medical staff; they report directly to the IDOC Medical Director. Ault testified that the only action the warden could take when confronted with an inmate waiting for dentures is to "[p]ut it back to the decision-makers." Ault Dep. 11:18–19, Pl. App. 35. Defendant Baldwin, the Director of the IDOC, testified that he learned of the long wait for dentures at ISP in a conversation with the warden and others that happened sometime between 2008 and 2010. Baldwin testified that the waiting time for dentures came up in connection with concerns regarding dentist turnover, and that the overall conversation was globally focused on medical care at ISP. Baldwin testified that he deferred to medical and dental staff, including Dr. Deol, to determine whether prisoners were receiving acceptable care while the IDOC addressed dentist staffing.

## IV. DISCUSSION AND ANALYSIS

Cullor sues all Defendants in their individual and official capacities. Because different standards and defenses apply to suits under 42 U.S.C. § 1983 against officials in their individual capacity, than in suits against officials in their official capacity, the Court must analyze these claims separately. See Kentucky v. Graham, 473 U.S. 159, 166–67 (1985).

## A. Claims Against Defendants in Their Official Capacities

"A suit against a public official in his official capacity is actually a suit against the entity for which the official is an agent." Elder-Keep v. Aksamit, 460 F.3d 979, 986 (8th Cir. 2006) (citing Graham, 473 U.S. at 165). Damage actions in federal court against state officials in their official capacities are generally barred by the Eleventh Amendment. See 281 Care Comm. v. Arneson, 638 F.3d 621, 632 (8th Cir. 2011) (citing Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)).

Because all of the Defendants are state officials sued in their official capacities, it is recommended that the Court grant summary judgment in favor of Defendants to the extent Cullor seeks monetary damages against them in their official capacities. Cf. Reynolds v. Dormire, 636 F.3d 976, 981 (8th Cir. 2011) (affirming dismissal of Eighth Amendment action under section 1983 against Missouri prison warden in his official capacity because equitable remedies were not available and damage claim was barred by the Eleventh Amendment).

The Eleventh Amendment does not bar Cullor from seeking injunctive relief from the Defendants in their official capacities. See 281 Care Comm., 638 F.3d at 632 (citing generally Ex Parte Young, 209 U.S. 123 (1908)). Cullor seeks injunctive relief, specifically, "adequate assurance that he will not have to wait another six years in the future if his current dentures break, or he needs new ones," and a declaratory judgment "that any wait longer than 12 months per se violates the Eighth Amendment." Pl. Br. at 23, ECF No. 54-3 (citing Helling v. McKinney, 509 U.S. 25, 33 (1993)). Cullor argues that his receipt of dentures in November 2012 does not render these claims moot.

"[A] prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions." Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted). Claims for declaratory relief may also be found moot. Cf. Simes v. Ark. Jud. Discipline & Disability Comm'n, 734 F.3d 830, 835 (8th Cir. 2013) (citation omitted) ("Article III does not authorize federal courts to offer legal advice about hazy potentialities."). If re-exposure to the challenged conditions is likely, then a court may review claims for injunctive and declaratory relief as "capable of repetition yet evading review." See Zajrael v. Harmon, 677 F.3d 353, 355 (8th Cir. 2012) (per curiam) (citing City of L.A. v. Lyons, 461 U.S. 95, 109 (1983) and Smith v. Hundley, 190 F.3d 852, 855 (8th Cir. 1999)).

Cullor did not introduce any evidence showing that he is likely to again need dentures while at ISP, or that, if he did, he would face an extended delay to get dentures. Cf. Johnson Aff. ¶ 3, Def. App. 4 (stating that Denture List was reduced to 18 prisoners as of January 31, 2014, from 55 in July 2012). Because Cullor is no longer subject to the conditions of his confinement that he challenges, and there is no showing in the record that he is likely to again be subject to those conditions, it is respectfully recommended that the Court dismiss Cullor's claims for injunctive and declaratory relief as moot.

## B. Claims Against Defendants in Their Individual Capacities

Cullor also seeks monetary damages and injunctive and declaratory relief against Defendants in their individual capacities. For the same reasons discussed above on the official-capacity claims, it is respectfully recommended that the Court dismiss Cullor's claims for injunctive and declaratory relief as moot.

Defendants argue in part that they are entitled to summary judgment on Cullor's individual-capacity claims for damages, because Cullor has not presented sufficient evidence for a reasonable jury to conclude that they were deliberately indifferent to his serious medical needs, and alternatively, their conduct was not clearly proscribed under existing law, entitling them to qualified immunity.[7] Cullor argues that his increased risk of choking and his jaw pain were serious medical needs, and that Defendants were deliberately indifferent to those needs by not providing him with dentures sooner. Cullor also argues that ISP's obligation to provide dentures was clearly established under existing law, pointing to this Court's decision in Campbell v. Dunham, 4:07-cv-00567-JAJ, 2010 WL 7361158 (S.D. Iowa Oct. 27, 2010).

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). The doctrine, when applicable, is more than an affirmative defense but actually provides immunity from suit; thus it is vital to address qualified immunity as early as possible. Pearson, 555 U.S. at 231. Under this standard, there is "ample room for mistaken judgments," and "all but the plainly incompetent or

---

[7] Defendants also collectively argue that Cullor's claims arising prior to March 30, 2010, are barred by the applicable statute of limitations. See Def. Br. at 4, ECF No. 43-2. Defendants do not point to any specific conduct that occurred before March 30, 2010, that they contend is part of one of Cullor's claims that should be barred.

those who knowingly violate the law" are protected by qualified immunity. Hunter v. Bryant, 502 U.S. 224, 229 (1991) (internal quotation marks and citation omitted).

"Qualified immunity involves the following two-step inquiry: (1) whether the facts shown by the plaintiff make out a violation of a constitutional or statutory right, and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." Brown v. City of Golden Valley, 574 F.3d 491, 496 (8th Cir. 2009). The Court need not address the steps in a particular order. Pearson, 555 U.S. at 236. Because the parties' briefs focus much more extensively on whether Cullor has made out a violation of a constitutional right, that issue will be addressed first.

A prisoner is entitled to receive adequate medical care under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 103 (1976). A prison official is liable for a failure to provide medical care if the official is deliberately indifferent to a prisoner's serious medical need. Id. at 104. To prevail on an Eighth Amendment claim, the inmate must show that he suffered from an objectively serious medical need, and that the prison officials knew of the need but deliberately disregarded it. Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005).

**1. Whether Cullor Had an Objectively Serious Medical Need**

"A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Schaub, 638 F.3d at 914 (quoting Camberos v. Branstad, 73 F.3d 174, 176 (8th Cir. 1995)). "A medical need that would be obvious to a layperson makes verifying medical evidence unnecessary." Id. (citing Hartsfield v. Colburn, 371 F.3d 454, 457 (8th Cir. 2004)). Whether a prisoner had an objectively serious medical need is a question of fact. Id. at 915 (citation omitted).

In Campbell v. Dunham, No. 4:07-cv-00567-JAJ, 2010 WL 7361158, *5 (S.D. Iowa Oct. 27, 2010), the court concluded that "[a] lack of dentures can rise to an objectively serious medical need." Id. at *5 (citing Wynn v. Southward, 251 F.3d 588, 593 (7th Cir. 2001) and Beem v. Davis, 289 F. App'x 305, 307 (10th Cir. 2008)). The Campbell court, reviewing a Magistrate Judge's bench trial findings de novo, found that a prisoner at the Clarinda Correctional Facility had demonstrated a serious medical need by simply proving that he was edentulous for twenty-one months prior to filing his complaint and had difficulty chewing food. Id. at *6–8.

13

In Alspach v. Baldwin, a recent case in this District, summary judgment was granted to the defendant prison officials, holding that both plaintiffs—who had waited for dentures at ISP for five years while completely edentulous, and four years with only four lower teeth, respectively—failed to raise a genuine dispute of material fact over whether they had a serious medical need. Order on Mot. Summ. J. at 2–3, 10, No. 4:11-cv-00383-JAJ (S.D. Iowa July 21, 2014), ECF No. 57. The court found "no evidence whatsoever that either [plaintiff] suffered anything more than discomfort or general soreness as a result of not having dentures." Id. at 10. The court noted that one of the plaintiffs "submitted no affidavit or other statement whatsoever to indicate what injuries or harm he suffered [while waiting for dentures," and that the other plaintiff "[did] not assert that he ever sought treatment for pain, discomfort or other medical condition." Id. The Alspach court distinguished Campbell, because the Campbell plaintiff "suffer[ed] from other medical conditions that created the serious medical need." Id. at 9; see also Campbell, 2010 WL 7361158, at *2 (discussing plaintiff's allegations of "burning feces, bruised and bleeding gums, lack of sleep and impaired speech," and inability to comply with dietary requirements of hepatitis C treatment).

An inmate's lack of teeth is not itself a serious medical need, but the complications from a lack of teeth in a particular case may present serious medical needs to which a prison official must respond. Cf. Farrow v. West, 320 F.3d 1235, 1243–44 (11th Cir. 2003) (citing Hunt v. Dental Dep't, 865 F.2d 198, 200 (9th Cir. 1989) and Ramos v. Lamm, 639 F.2d 559 576 (10th Cir. 1980)) ("In certain circumstances, the need for dental care combined with the effects of not receiving it may give rise to a sufficiently serious medical need . . . ."), cited with approval in Alspach, supra, at 9.

Cullor asserts that his lack of teeth (1) placed him at an increased risk of choking; (2) exacerbated his acid reflux; (3) impaired his ability to communicate with others, including patients during his work in the HCU; and (4) caused him constant jaw pain and headaches.

Cullor has not entered any evidence in the record, by affidavit or otherwise, supporting his grievance assertion—first raised in his second-level appeal to Lockwood-Dahm in November 2011—that he was choking on food due to difficulty chewing. Cullor does not argue in resistance to Defendants' motion that he actually had choking episodes. The medical testimony cited by Cullor attributing a risk of increased choking to being edentulous is immaterial, because Cullor has not shown that this risk ever materialized into a choking episode before he received dentures.

14

See Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997) (citation omitted) ("An inmate's failure to place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment precludes a claim of deliberate indifference to medical needs.").

Likewise, Cullor has not introduced any medical evidence that being edentulous exacerbated his acid reflux, or that this alleged effect would be obvious to a layperson. Cullor also did not state in any detail in his affidavit the degree to which he was having difficulty speaking. He stated that he "could not talk loud enough or clear enough for the older patients in the Health Services area to hear [him] clearly," but also admits that he was able to communicate with medical personnel in the HCU. Cullor Aff. ¶¶ 8–9, Pl. App. 60.

Cullor did, however, consistently assert that he had chronic, constant jaw pain, which ceased after he received dentures. Dr. Sparks testified that jaw pain is common in edentulous patients. It is undisputed that Cullor complained of jaw pain and headaches to ISP dental staff in his kite dated August 23, 2011, and in all three of his grievance filings spanning October 25, 2011, to November 28, 2011. A reasonable jury could find that Cullor's pain over this period, which he made known to ISP staff and is medically consistent with his lack of teeth, was an objectively serious medical need under the Eighth Amendment. See Estelle v. Gamble, 429 U.S. 97, 103 (1976) (citation omitted) ("In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose."); cf. Wise v. Lappin, 674 F.3d 939, 941–42 (8th Cir. 2012) (per curiam) (reversing summary judgment where prisoner reported severe jaw pain from broken jaw and waited approximately three and a half months for surgery); Fields v. Gander, 734 F.2d 1313, 1315 (8th Cir. 1984) (reversing summary judgment where jail inmate had severe pain and facial swelling for two weeks from infected tooth). Although Cullor's jaw pain was not diagnosed as needing any certain treatment, it did abate once he received dentures; a reasonable jury could find that it would be obvious to a layperson that Cullor needed medical attention for chronic, constant jaw pain.

Because the facts, when viewed in the light most favorable to Cullor, support his claim that he suffered from an objectively serious medical need, it must be determined whether Cullor has raised a genuine dispute of material fact over whether any Defendant acted with deliberate indifference to that need, before a reasonable jury could find that Cullor has established a constitutional violation.

### 2. Whether Defendants Were Deliberately Indifferent to Cullor's Serious Medical Need

Prison staff are deliberately indifferent when they exhibit a conscious disregard for a prisoner's need for medical treatment. See Farmer v. Brennan, 511 U.S. 825, 837 (1994). To be found deliberately indifferent, a prison official must have actual knowledge of "an excessive risk to inmate health or safety." Id. Defendant officials may have sufficient knowledge of the risk, even though they do not know that the plaintiff personally was likely to be injured. See id. at 843–44. "Deliberate indifference may be manifested by prison doctors in responding to the prisoner's needs or by prison officials in intentionally denying or delaying access to medical care or intentionally interfering with prescribed treatment." Meloy v. Bachmeier, 302 F.3d 845, 849 (8th Cir. 2002) (citing Estelle, 429 U.S. at 104–05).

Defendants argue that they are entitled to summary judgment because Cullor was seen and treated by ISP dental staff while he had teeth, and prescribed reasonable treatment for his dental problems while edentulous. Cullor argues that Defendants were deliberately indifferent for failing to adequately staff and fund ISP dental services, allowing the entire population there, including him, to be subjected to long delays in receiving dentures. Cullor claims that Defendants knew that his lack of teeth caused him pain, and were deliberately indifferent to that pain.

### a. Dental Staff (Larson, Cooper, and Nye)

There is sufficient evidence to support a finding that Drs. Larson and Cooper knew, from their review of Cullor's records, that ISP inmates qualifying for dentures were waiting up to four years for them. But it is undisputed that Drs. Larson and Cooper both last saw Cullor for checkups prior to his August 2011 complaints of jaw pain. There is no evidence in the record that their decision to not move him to the top of the Denture List at any point was anything other than a good-faith determination that his need for dentures was no more immediate than inmates ahead of him on the list.

In Peralta v. Dillard, 744 F.3d 1076 (9th Cir. 2014) (en banc), the court affirmed the giving of the following instruction to a jury that found for a prison dentist in an Eighth Amendment action:

> Whether a dentist . . . met his duties to Plaintiff . . . under the
> Eighth Amendment must be considered in the context of the

personnel, financial, and other resources available to him or her or
which he or she could reasonably obtain.

Id. at 1082. The Peralta plaintiff requested dental care for tooth pain and bleeding gums
immediately upon his arrival at a California state prison where the prisoner-to-dentist ratio was
more than twice the ratio prescribed by state policy. Id. at 1081. He was placed on a waiting list,
and although he met with the dentist within a few months, he waited eleven months for his first
treatment other than ibuprofen. Id. In affirming the jury instruction as to the prison dentist (Dr.
Brooks), the court held:

> A prison medical official who fails to provide needed treatment
> because he lacks the necessary resources can hardly be said to have
> intended to punish the inmate. The challenged instruction properly
> advised the jury to consider the resources Brooks had available in
> determining whether he was deliberately indifferent.

Id. at 1084.

Cullor acknowledges—and even bases his arguments against Deol, Baldwin, and
Ludwick on—the fact that ISP's shortage of dentists was the cause of his long wait on the
Denture List. Cullor has not asserted or made any showing that Drs. Larson and Cooper could
have gotten to his point on the waiting list while they worked at ISP, or that they consciously
disregarded his needs by not advancing him on the list ahead of other ISP inmates needing
dentures. As a matter of law, Drs. Larson and Cooper were not deliberately indifferent to
Cullor's serious medical needs.

Dental Assistant Nye responded to the kite from Cullor in August 2011, in which he first
complained of constant jaw pain. She therefore knew of Cullor's dental issues that could be a
serious medical need. But Cullor does not assert or show that Nye failed to act on this knowledge
in any specific way, or that she could have done anything beyond recording his kite in his dental
chart and offer to schedule him to see the dentist, which the record shows that she did. As a
matter of law, Nye was not deliberately indifferent to Cullor's serious medical needs.

### b. Grievance Officers (DeGrange, Bowker, and Lockwood-Dahm)

DeGrange, Bowker, and Lockwood-Dahm each knew of Cullor's jaw pain through his
complaints in his filed grievances. Like the dental staff Defendants, there is no evidence in the
record that DeGrange failed to do something he could or should have done. See Peralta, 744 F.3d
at 1082 ("What is reasonable depends on the circumstances, which normally constrain what

actions a state official can take."). Cullor does not dispute that DeGrange contacted ISP Nursing Director Harrison, who was familiar with Cullor's situation, and that Harrison told DeGrange that Cullor was near the top of the Denture List, and that he was working with a new dentist to speed progress through the list. There is no evidence in the record that DeGrange disregarded Cullor's needs once he knew of them. Cullor does not contend that any inmates ahead of him on the list needed dentures less urgently than he did, or—if that was the case—that DeGrange knew that and should have ordered him placed at the top of the list, absent the ability to order the understaffed ISP dentistry to move faster through the list. There is no evidence that DeGrange deliberately failed to anything that he could have done to address Cullor's medical needs. As a matter of law, DeGrange was not deliberately indifferent to Cullor's serious medical needs.

There is no showing in the record that Bowker or Lockwood-Dahm possessed authority beyond ruling on the propriety of DeGrange's grievance response. Because there is no evidence that Bowker or Lockwood-Dahm deliberately failed to do something they could have done to address Cullor's wait time for dentures, they also, as a matter of law, were not deliberately indifferent to Cullor's serious medical needs.

### c. Warden Ludwick

There is no evidence in the record that Ludwick knew of Cullor's specific situation, but viewing the record in the light most favorable to Cullor, Ludwick did learn in December 2010 of the risk of pain or discomfort that edentulous inmates were exposed to by being on the Denture List for extended periods of time. See Farmer, 511 U.S. at 843–44. Cullor does not dispute that IDOC Director Baldwin learned—sometime between 2008 and 2010—from ISP's Warden (either Ludwick or Ault) that prisoners were having to wait long periods for dentures after qualifying for them. Cullor also does not dispute that the Warden at ISP does not have any authority over medical staff, nor does he dispute that Dr. Deol was actively recruiting to find more dentists to work at ISP during Ludwick's time as Warden.

The undisputed facts show that Ludwick could not have taken any action to shorten Cullor's wait time for dentures, other than notify medical staff, Dr. Deol, or Baldwin, all of whom already knew of Cullor's specific situation, or of the delays in receiving dentures at ISP. There is no evidence in the record that Ludwick failed to do anything he could have done to address the wait time for dentures at ISP, much less that he deliberately failed to take action to

provide dentures to those inmates in need. As a matter of law, Ludwick was not deliberately indifferent to Cullor's serious medical needs.

### d. Medical Director Deol

Viewing the record in the light most favorable to Cullor, Dr. Deol—like Ludwick—knew generally of the risk of discomfort, pain, or choking faced by inmates needing dentures at ISP. There is sufficient evidence in the record for a reasonable jury to conclude that Dr. Deol could have greatly reduced the wait time for dentures for Cullor—along with other ISP inmates—by hiring additional dentists at ISP.

But Cullor has not submitted any evidence to contradict Dr. Deol's testimony that he is constantly recruiting dentists, but finds it difficult to employ them at ISP. Cullor does not dispute Dr. Deol's testimony that the dentists who left ISP while Cullor was on the Denture List did so for non-monetary reasons. Cullor correctly argues that "[c]osts cannot be used as a reason for denying constitutionally required medical care." Pl. Br. at 18–19 (citing Revere v. Mass. Gen. Hosp., 463 U.S. 239, 245 (1983); Fields v. Gander, 734 F.2d 1313, 1314–15 (8th Cir. 1984) (per curiam); and Benter v. Peck, 825 F. Supp. 1411, 1417 (S.D. Iowa 1993)). Although Dr. Deol admitted several times in his deposition that the salary he was authorized to offer new dentists likely impacted his ability to recruit, Cullor does not dispute that Dr. Deol always offered the maximum salary he was allowed to, and also sought to increase the salary amount for new dentists with special skills. Cullor has not established that he was denied constitutionally required medical care based on cost considerations.

Defendants do not dispute that the IDOC did not employ a full-time dentist at ISP for most of the time Cullor was on the Denture List. Although Dr. Deol admitted that hiring dentists was his responsibility, finding him liable under 42 U.S.C. § 1983 and the Eighth Amendment requires finding that he had "a sufficiently culpable state of mind . . . . akin to recklessness." Lenz v. Wade, 490 F.3d 991, 995 (8th Cir. 2007) (citations omitted). There is nothing in the record beyond "pure speculation, which is insufficient to avoid summary judgment," Elam v. Regions Fin. Corp., 601 F.3d 873, 880 (8th Cir. 2010) (citation omitted), to suggest that Dr. Deol deliberately failed to staff an adequate number of dentists at ISP, or that he could have taken any other measure to generally reduce the Denture List waiting time at ISP, and Cullor's wait in particular.

Cullor has not raised a genuine dispute over whether Dr. Deol acted with deliberate indifference to his serious medical needs. Dr. Deol is entitled to judgment as a matter of law.

### e. Director Baldwin

Viewing the record in the light most favorable to Cullor, Baldwin also knew that ISP inmates qualifying for dentures faced risks to their health. Baldwin's testimony indicates that he was not personally involved in recruiting new dentists, but likely directed—upon learning of the situation at ISP—that the IDOC continue its recruiting efforts. His testimony also indicates that he deferred to Dr. Deol's medical opinion of whether the health of inmates on the Denture List was being sufficiently maintained during their wait time for dentures.

As with Dr. Deol, there is no evidence in the record that Baldwin deliberately failed to staff ISP with enough dentists, or in any way, ratified, condoned, or accepted the shortage of dentists at ISP, or was attempting to inflict pain or harm on Cullor or those on the Denture List, by limiting the number of dentists at ISP. See Estelle, 429 U.S. at 104–06. Cullor does not dispute Dr. Deol's deposition testimony that ISP had five different dentists from 2009 to 2012. Cullor also does not dispute that those that left—all but Dr. Johnson—did so for non-monetary reasons. There is no evidence in the record, nor any argument that Baldwin deliberately failed to take any measures which could have guaranteed that dentists stayed at ISP, or that more dentists could have been employed at ISP before Cullor received his dentures.

As a matter of law, Baldwin was not deliberately indifferent to Cullor' serious medical needs.

### f. Summary for All Defendants

Cullor has not raised a genuine dispute of material fact over whether any Defendant was deliberately indifferent to his serious medical needs.[8] Cullor has therefore not raised a triable issue over whether he suffered a violation of a constitutional right. All Defendants but Abernathy

---

[8] It is worth noting that no Defendant has relied on the IDOC's FMTE treatment consent form, signed by Cullor and quoted at page eight of this Report and Recommendation, whereby Cullor purports to waive his right to dentures, even if it was later determined that he needed them for functional purposes. Reliance on prisoners' consent to deny necessary follow-up care after a major procedure like an FMTE may itself exhibit deliberate indifference to serious medical needs, or obdurate behavior on the part of correctional officials. Nonetheless, based on the facts of this case, no individual Defendant could reasonably be found to have exhibited deliberate indifference to Cullor's serious medical needs.

are entitled to qualified immunity and judgment as a matter of law. It is respectfully recommended that the Court grant Defendants' Motion for Summary Judgment in its entirety.

## C. Failure to Serve Defendant Abernathy

The Court's Initial Review Order (ECF No. 8) ordered that:

> Service of process to the Defendants Baldwin, Lockwood, Deol, Ludwick, Bowker, DeGrange, Larson, Cooper, Abernathy, Nye, and to the Attorney General of the State of Iowa shall issue by the electronic filing of this complaint. The Attorney General is directed to notify this Court immediately if he lacks the consent of the Defendants to appear generally on their behalf and submit to the jurisdiction of the Court.

Initial Review Order at 5. On June 11, 2012, the Attorney General of Iowa filed a Notice (ECF No. 10), that his office would not be representing Defendants Larson, Cooper, and Abernathy, and that those Defendants had not been served. On July 9, 2012, the Court ordered Plaintiff to "immediately provide the Clerk with a current address for the unserved Defendants, if available, so service can be obtained," and extended the deadline for service of process to August 20, 2012. Order at 1, ECF No. 11.

On July 23, 2012, the Court appointed counsel for Plaintiff. Appointed counsel moved twice (ECF Nos. 16, 19) to extend the deadline for service. The Court granted both motions, ultimately extending the deadline for service to February 1, 2013. Text Order, ECF No. 20.

On January 24, 2013, Plaintiff's counsel filed proof of service on Drs. Larson and Cooper. On March 7, 2013, the Iowa Attorney General filed an Answer on behalf of Drs. Larson and Cooper. No proof of service on Abernathy has been filed, and Abernathy has not appeared.

Because the February 1, 2013 deadline to complete service has passed, the Court must either dismiss Cullor's claims against Abernathy, or allow Cullor a specified amount of time to complete service upon Abernathy. See Fed. R. Civ. P. 4(m). If Cullor can show good cause for failing to complete service upon Abernathy, the Court "must extend the time for service for an appropriate period." Id.

"A showing of good cause requires at least 'excusable neglect'—good faith and some reasonable basis for noncompliance with the rules." Adams v. AlliedSignal Gen. Aviation Avionics, 74 F.3d 882, 887 (8th Cir. 1996) (citations omitted). This Report and Recommendation shall constitute notice to Cullor that the Court is considering the issue of whether to allow

additional time for service of process upon Abernathy. See Fed. R. Civ. P. 4(m) (court may decide "on motion or on its own after notice to the plaintiff").

Cullor's appointed counsel knew that Abernathy had not been served, and was twice granted extensions of time to serve Abernathy, along with Larson and Cooper. Approximately eighteen months have passed since the most recent deadline to complete service, and no proof of service on Abernathy has been filed. It is respectfully recommended, if Cullor, in his objections to this Report and Recommendation, fails to show good cause for not serving Abernathy, that the Court dismiss Cullor's claims against Abernathy without prejudice, pursuant to Fed. R. Civ. P. 4(m).

## V. RECOMMENDATION AND ORDER

Because Plaintiff Charles Cullor has not raised a genuine dispute of material fact over whether any Defendant was deliberately indifferent to his serious medical needs, it is **respectfully recommended** that the Court **grant** the Motion for Summary Judgment (ECF No. 43), and order the entry of judgment in favor of Defendants John Baldwin, Harbons Deol, Sheryl Lockwood-Dahm, Nick Ludwick, Rebecca Bowker, Dave DeGrange, Mark Larson, Stephanie Cooper, and Monica Nye.

Because Cullor has not filed proof of service on Defendant Grant Abernathy, it is respectfully recommended that the Court consider whether to extend time for service of process on this Defendant. Cullor will have an opportunity to address this issue in response to this Report and Recommendation. If Cullor fails to object, or fails to show good cause for not completing service of process on Abernathy, it is respectfully recommended that the Court **dismiss** Cullor's claims against Abernathy **without prejudice**.

IT IS ORDERED that the parties have until **August 18, 2014**, to file written objections to this Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Thompson v. Nix, 897 F.2d 356, 357 (8th Cir. 1990); Wade for Robinson v. Callahan, 976 F. Supp. 1269, 1276 (E.D. Mo. 1997). The Court will freely grant such extensions. Any objections filed must identify the specific portions of the Report and Recommendation and relevant portions of the record to which the objections are made, and must set forth the basis for such objections. See Fed. R. Civ. P. 72; Thompson, 897 F.2d at 357. Failure to timely file objections may constitute a waiver of a party's right to appeal questions of

fact. Thomas v. Arn, 474 U.S. 140, 155 (1985); Griffini v. Mitchell, 31 F.3d 690, 692 (8th Cir. 1994).

Due to the delay in submission of the Motion for Summary Judgment, and the need for time to consider any objections to this Report and Recommendation, the Final Pretrial Conference set for September 2, 2014, and Jury Trial set for September 15–17, 2014, are hereby **cancelled**, and will be rescheduled, if necessary, once the District Court issues its ruling.

IT IS SO ORDERED

Dated this 31st day of July, 2014.

Celeste F. Bremer
Chief U.S. Magistrate Judge

# ATTACHMENT A

## 1. Plaintiff's Teeth on July 28, 2005

At his earliest appointment noted in the record, Cullor was missing his teeth numbered 1, 2, 3, 14, 15, 16, 17, 18, 19, 30, and 32 (see diagram at right, marked by "X"). Cullor's tooth number 31 was scheduled at this appointment to be extracted (marked by "--"). Per IDOC policy, he was eligible for partial dentures at this time.



## 2. Plaintiff's Teeth from November 17, 2009, to October 13, 2010

Cullor had his number 31 tooth extracted on August 3, 2005. His next extraction was on November 17, 2009, when his teeth numbered 12 and 13 were extracted. Between those extractions, he had the surfaces of six teeth restored (five of which are marked by "O" at right; the sixth was number 12, which was later extracted). After November 17, 2009, his next major dental procedure was the extraction of his remaining teeth on October 13, 2010, which left him edentulous.

